UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-60995-CIV-DAMIAN/Strauss

SAMUEL MATTHEWS-PACE,

     Plaintiff,

v.

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL-CIO, LOCAL 1416,

     Defendant.

_____/

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 50]

**THIS CAUSE** is before the Court on Defendant, International Longshoremen Association Local Union 1416's ("Defendant" or "the Union"), Motion for Summary Judgment, filed on January 16, 2026 [ECF No. 50 (the "Motion")].

THE COURT has considered the Motion, the Response [ECF No. 61 ("Response")] and Reply [ECF No. 63 (the "Reply")] thereto, the parties' Statements of Material Facts [ECF Nos. 51, 62, and 64], the applicable law, and the pertinent portions of the record and is otherwise fully advised.

### BACKGROUND[1]

#### A.    *Introduction.*

Plaintiff, Samuel Matthews-Pace ("Matthews-Pace" or "Plaintiff"), has worked as a longshoreman at the Port of Miami since 1997 and currently works as a Header. DSOF ¶¶ 2-

---

[1] The facts here are taken from the portions undisputed across both Defendant's Statement of Material Facts [ECF No. 51 ("DSOF")] and Plaintiff's Oppositional Response to Defendant's Statement of Facts [ECF No. 62 ("PSOF")], or across Plaintiff's Statement of Additional Facts [ECF No. 62 at 6 ("PSAF")] and Defendant's Response to Plaintiff's Statement of

3; PSOF ¶¶ 2-3. Matthews-Pace has been a member of the Union since 2003. DSOF ¶ 1; PSOF ¶ 1. His work at the Port of Miami consists of, *inter alia*, helping to load and unload cruise ships and supervising the same.

The events central to this lawsuit relate to whether the Union breached its bylaws by failing to discipline Matthews-Pace's subordinate, Lynette Burney ("Burney"), after he complained of her misconduct and by filing allegedly unfounded grievances against him in retaliation for his complaints. *See generally* ECF No. 34 ("Second Amended Complaint").

### B.     *Complaints Against Burney.*

The facts relevant to the Motion begin with Matthews-Pace's eight written complaints against Burney regarding her work performance. On May 4, 2023, he wrote a letter to the Union's Executive Board reporting that Burney walked off the job on May 4 and on April 15 in disregard of his authority. Sec. Am. Compl. at 13. On May 29, 2023, he wrote another letter to the Executive Board notifying the Union that Burney failed to follow his instructions when he asked her to pick up bags and stack baskets. *Id.* at 14. On July 7, 2023, Matthews-Pace wrote a third letter to the Executive Board informing it that on June 23, Burney left the job at 3 p.m., causing other workers to have to pick up the slack. *Id.* at 15. On August 23, 2023, he wrote a fourth letter to the Executive Board informing them that Burney had left early again, making it the fourth time that year, and he asked for the Union to set up a meeting with Burney. *Id.* at 16.

On November 30, 2023, Matthews-Pace notified the Secretary-Treasurer of incidents on November 24 and 25 when Burney moved pallets using a forklift and damaged cargo on

---

Additional Facts [ECF No. 64 ("DSAF")]. Where facts are pulled from unrebutted record citations that are not reflected in either party's statements of facts, those citations are specifically provided.

multiple occasions, causing Matthews-Pace to reassign her to luggage handling tasks so she would not damage more cargo. *Id.* at 17. He wrote another complaint to the Secretary-Treasurer on January 13, 2024, explaining that he asked Burney to help other gang members break down pallets, but she refused to do that and began sweeping trash off the floor instead. *Id.* at 19. On February 16, 2024, Matthews-Pace submitted another complaint about Burney to several Executive Board members, notifying them that Burney failed to complete a task that he assigned to her within eighty minutes, which he then completed himself. *Id.* at 20. Matthews-Pace filed a final complaint to the Union Board members on February 25, 2024, notifying them that Burney failed to complete a task she was assigned. *Id.* at 21.

These eight complaints are all the communications Matthews-Pace sent to the Union about Burney. *See* DSOF ¶ 5; PSOF ¶ 5; ECF No. 51-1 at 13:21-14:3.

### C. *Alleged Retaliation Suffered By Matthews-Pace.*

On July 15, 2024, approximately five months after he made his last complaint about Burney, the Union suspended Matthews-Pace as Header "based on a report that [Matthews-Pace] had neglected as the Header to instruct and respond appropriately in a timely manner to a situation requiring immediate attention at the Port." [ECF No. 51-2 ¶ 6]; *id.*, Ex. A. Matthews-Pace explains that he "didn't do anything wrong that day," he asked Burney "to take something out, and she refused to do it, and they suspended me." [ECF No. 51-1 at 26:20-22]. The duration of the suspension was until the matter was heard by the Labor Relations Committee ("LRC"), which is made up of no more than three representatives of the employers and no more than three representatives of the Union, none of which are parties to the grievance. DSOF ¶¶ 24-25; PSOF ¶¶ 24-25. The LRC heard the matter on August 21, 2024, and the LRC unanimously decided to suspend Matthews-Pace as Header until October

3

1, 2024 (though he was able to continue working as a longshoreman during his suspension). DSOF ¶¶ 26, 28-29; PSOF ¶¶ 26, 28-29.

The Union issued Matthews-Pace another grievance on January 21, 2025, regarding an incident that happened on January 13th. On that day, a Union Business Agent called Dana Ferguson, Jr., a forklift operator on Matthews-Pace's gang, to report to another work location. DSOF ¶¶ 30-31; PSOF ¶¶ 30-31. When Matthews-Pace heard of the transfer, he spoke on the phone with the Union Vice President, Steven Hopkins ("Hopkins"), and the Union President, Eugene Dixon ("Dixon"), and communicated his need for Dana Ferguson, Jr.'s services and questioned why they were transferring Ferguson. DSOF ¶¶ 33-35; PSOF ¶¶ 33-35. The parties dispute how the call ended: the Union officers believe that Matthews-Pace hung up on them, while Matthews-Pace claims that the call dropped. DSOF ¶ 35; PSOF ¶ 35.

On January 21, 2025, the Secretary-Treasurer, Dana Ferguson (not to be confused with the forklift operator Dana Ferguson, Jr.), filed a grievance against Matthews-Pace charging him with a violation of the Union Bylaws for "Refusal to carry out a needed operation or task when requested to do so by the Business Agent." DSOF ¶ 36; PSOF ¶ 36. The Union offered Matthews-Pace an eight-day suspension from his Header position as punishment for allegedly hanging up on Hopkins and Dixon, which he declined in favor of another LRC hearing. DSOF ¶ 37; PSOF ¶ 37. At the LRC hearing on February 5, 2025, Matthews-Pace was suspended from *all* work for thirty days. DSOF ¶ 40; PSOF ¶ 40.

Matthews-Pace filed a Charge with the National Labor Relations Board ("NLRB") on March 12, 2025, regarding his thirty-day suspension. DSOF ¶ 42; PSOF ¶ 42. The NLRB investigated the Charge and dismissed it in September 2025 and then dismissed an appeal of the decision on January 13, 2026. DSOF ¶¶ 44-46; PSOF ¶¶ 44-46.

In May 2025, there were multiple instances in which the Union took Matthews-Pace off jobs for which employers requested him. According to Matthews-Pace, his name would be on the order issued the day before, but by the evening, someone would remove his name from the order. *See* DSOF ¶ 48; PSOF ¶ 48; PSAF ¶ 6; DSAF ¶ 6.[2] Matthews-Pace also claims he has been antagonized at the Union Hall by members of the Union Executive Board, including President Dixon, Vice President Hopkins, Secretary-Treasurer Dana Ferguson, Larry McKnight, and Dalandrius Jackson. PSAF ¶ 7; DSAF ¶ 7. Specifically, President Dixon told Matthews-Pace in the Hall one day that he was "going to make sure that [Matthews-Pace got] removed as a supervisor." [ECF No. 51-1 at 37:12-13]. During his deposition in December 2025, Matthews-Pace could not recall any other specific instances when he was antagonized or chastised in public at work. *See id.* at 39:12-19.

Matthews-Pace is still a Header for the Union, and he still works at the Port of Miami. DSOF ¶¶ 57-59; PSOF ¶¶ 57-59. He has not lost any seniority with the Union. DSOF ¶ 60; PSOF ¶ 60.

---

[2] The Union disputes whether Matthews-Pace was ever removed from roster lists, but in the Declaration cited by the Union, the Union President, Dixon, does not deny that Matthews-Pace was ever removed—he simply states that on a particular week, he personally did not remove Matthews-Pace. *See* ECF No. 51-2 ¶ 31 ("During the week of June 10, 2025, I did not remove or strip Mr. Pace of any Gang Header turns on any of the weekly rosters."). Because the Union does not deny with citation to the record that it ever removed Matthews-Pace from any Header roles, this Court must deem the fact admitted. *See* Fed. R. Civ. P. 56(e)(2); S.D. Fla. L.R. 56.1(c). The Union's "dispute" goes to the weight of the evidence but is not an actual dispute supported by record evidence. *See* DSAF ¶ 6 ("Disputed. Plaintiff testified that he could not recall when this allegedly occurred and did not identify specific dates."); *Baker v. Upson Reg. Med. Ctr.*, 94 F.4th 1312, 1317 (11th Cir. 2024) (holding that on summary judgment, "the court will not make credibility determinations or weigh the parties' evidence").

### D. The Union's Bylaws.

Matthews-Pace, as a Union member, and the Union agree to abide by certain Bylaws, which provide for rules, duties, and processes to follow in the event of a dispute. The Bylaws provide the exclusive mechanism for Union members to use to initiate charges against other members for violations of the Bylaws, which is through the processes outlined in Articles XV and XVI. DSOF ¶ 8; PSOF ¶ 8.

Article XV lists "Offenses For Which Officers and Members May Be Charged and Tried," which include, as relevant here: "conduct unbecoming a member," "abuse of fellow members," "refusal of a member to carry out a needed operation or task when requested to do so by the Business Agent," and "failure of a member to report for work at a specified time after giving a Header his card." DSOF ¶¶ 9-11; PSOF ¶¶ 9-11. Article XVI sets forth the procedural steps for filing charges under the Bylaws: charges must be: (1) in writing, (2) made within thirty days of the occurrence or act, and (3) "filed with the Secretary-Treasurer who shall refer the same to the Trial Board for action." DSOF ¶ 7; PSOF ¶ 7.

And, Article XVIII, titled "Work Rules," includes the eight following provisions: (1) all members shall comply with Union rules; (2) no member shall start work or leave work without permission from his employer; (3) members shall not refuse to work for any employer unless they have good and sufficient excuse; (4) members shall not drink alcohol on the job; (5) members shall not take another member's job when said member is fired by his employer; (6) the Collective Bargaining Drug Program Agreement is incorporated in the Bylaws as part of the Union's Work Rules; (7) members shall not circumvent the hiring hall procedure; and (8) all members shall abide by the anti-discrimination and anti-sexual harassment policies which are incorporated in the Bylaws. DSOF ¶ 19; PSOF ¶ 19; Sec. Am. Compl. at 65-66.

6

Article XVIII does not incorporate an enforcement mechanism or provision. DSOF ¶ 20; PSOF ¶ 20.

### E.     The Instant Lawsuit.

Matthews-Pace filed this lawsuit in state court on September 13, 2024, with a Verified Petition for Permanent Restraining Order, seeking an injunction directing the Union to comply with their Bylaws. *See* ECF No. 1-1 at 75. On January 29, 2025, the Union filed an Amended Motion to Dismiss for lack of personal jurisdiction, insufficiency of process, lack of subject matter jurisdiction, and failure to state a cause of action. *See id.* at 46. The state court granted the motion to dismiss with leave to amend on April 17, 2025. *See id.* at 33.

Matthews-Pace filed the Amended Complaint[3] on May 7, 2025, asserting claims for breach of implied-in-fact contract (Count I), breach of the duty of fair representation (Count II), intentional infliction of emotional distress (Count III), Damages & Attorneys' Fees (Count IV), and Specific Performance (Count V). *See generally* ECF No. 1-1 ("Amended Complaint"). He named two unions as defendants in the Amended Complaint: Local 1416 and Local 1526/1526A (the "Two Unions"). The Two Unions timely removed the case to federal court on May 19, 2025, on the basis of federal question jurisdiction because the claims arise under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. *See* ECF No. 1 ¶ 11 (citing *Avco Corp. v. Aero Lodge No. 735*, 390 U.S. 557, 560 (1968)).

The Two Unions promptly filed a Motion to Dismiss on May 27, 2025, arguing that the Amended Complaint was preempted pursuant to *San Diego Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959), and that the NLRB has exclusive

---

[3] The pleading is styled "Complaint for Damages, Specific Performance, Continuing Injunctive Relief, and Other Equitable Remedies," but it was the amended pleading.

jurisdiction over the claims at issue. *See generally* ECF No. 3. While rejecting the Two Unions'

*Garmon* argument, this Court granted the Motion to Dismiss on other grounds, including that

some of the "claims" do not constitute causes of action but rather forms of relief, one of the

defendants was not properly served, and the Amended Complaint was a shotgun pleading.

*See generally* ECF No. 33. This Court granted Matthews-Pace leave to file a second amended

complaint. *Id.*

Matthews-Pace filed the Second Amended Complaint[4] on October 28, 2025, the

operative pleading. In the Second Amended Complaint, Matthews-Pace dropped Local

1526/1526A as a Defendant but kept Local 1416, and he streamlined the case into three

claims: Breach of Bylaws (Count I), Breach of Duty of Fair Representation (Count II), and

Intentional Infliction of Emotional Distress ("IIED") (Count III). *See generally* ECF No. 34

("Second Amended Complaint").

The Union filed a Motion to Dismiss on November 18, 2025, arguing that Matthews-

Pace failed to adequately allege any of his causes of action. *See generally* ECF No. 39. The

parties completed briefing on the Motion to Dismiss on December 9, 2025. *See* ECF Nos. 42

45.[5] On January 16, 2026, the Union filed the Motion now before this Court seeking summary

---

[4] The pleading is incorrectly titled "Amended Complaint."

[5] The Union filed the Motion for Summary Judgment a month after briefing had concluded on the Motion to Dismiss. The factual sufficiency issues identified in the Motion to Dismiss are reiterated in the Motion for Summary Judgment, the difference being the latter is based on a more complete factual record. Under the circumstances, this Court will analyze the issues presented in the Motion for Summary Judgment, and, in the interest of judicial efficiency, considers the Motion to Dismiss moot. *See Abdullah v. City of Jacksonville*, 242 F. App'x 661, 663 (11th Cir. 2007) (finding no error where district court did not act on motion to dismiss until granting motion for summary judgment and denying motion to dismiss as moot); *see also Bryson v. Berges*, No. 14-62323-CIV, 2015 WL 5000850, at *3 n.4 (S.D. Fla. Aug. 24, 2015) (Cohn, J.) ("Because it raises substantially the same issues and relies on a more fully developed record, Defendants' later-filed Motion for Summary Judgment supersedes their

judgment as to the three counts in the Second Amended Complaint. *See generally* Mot. Matthews-Pace filed his Response on February 17, 2026, and the Union filed its Reply on February 27, 2026. The Motion is now fully briefed and ripe for adjudication.

## II.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* In reviewing a motion for summary judgment, the Court is "required to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1143 (11th Cir. 2007)). Importantly, "at the summary judgment stage the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter," but only "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R.

---

Motion to Dismiss."); *Kremer v. Lysich*, No. 19-cv-887-BJD-JBT, 2021 WL 1845362, at *3 (M.D. Fla. Apr. 22, 2021) ("When the same arguments are raised in pending motions to dismiss and motions for summary judgment, several district courts in the Eleventh Circuit have concluded that it is appropriate to address the arguments in the context of the summary judgment motions.").

Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

"An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks omitted)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Channa Imps., Inc. v. Hybur, Ltd.*, No. 07-21516-CIV, 2008 WL 2914977, at *2 (S.D. Fla. July 25, 2008) (Simonton, M.J.) (quoting *Anderson*, 477 U.S. at 248). Further, "[f]or factual issues to be considered genuine, they must have a real basis in the record. For instance, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted).

### III.    DISCUSSION

In the Motion, the Union argues that it is entitled to summary judgment because Matthews-Pace cannot establish a *prima facie* case for breach of contract, breach of the duty of fair representation, or IIED. *See generally* Mot. Matthews-Pace responds that he has established a fact issue as to breach of the Bylaws and the implied duty of good faith and fair dealing, has sufficiently demonstrated that the Union's decisions were fueled by personal animosity, and has met his burden to show that the Union's conduct was sufficiently outrageous for IIED purposes. *See generally* Resp. The Union disagrees that any of the factual

and legal arguments raised in the Response move the needle. *See generally* Reply. This Court addresses each Count in turn.

### A. Count I: Breach Of Contract.

The parties agree that Florida law governs the breach of contract claims. "For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). The parties do not dispute the existence of a contract between Matthews-Pace and the Union, so the only contested elements are breach and damages.

Matthews-Pace identifies three purported "breaches" of the Bylaws: (1) failure to enforce the Work Rules under Article XVIII, (2) failure to investigate and initiate the charges made by Matthews-Pace against Burney; and (3) failure to enforce the Bylaws in accordance with the Union's implied duty of good faith and fair dealing. *See* Sec. Am. Compl. ¶ 44.

As a preliminary matter, the Union contends that Matthews-Pace never properly invoked the disciplinary process under the Bylaws by filing his complaints/charges (1) in writing, (2) within thirty days of the occurrence or act, and (3) with the Secretary-Treasurer. DSOF ¶ 7; PSOF ¶ 7. The Union argues that Matthews-Pace's "communications do not state the [he] was seeking to file 'charges' against Burney, they do not request a trial board hearing under the Bylaws, they were not submitted to the Secretary-Treasurer directly, and they and [*sic*] do not mention the Bylaws, much less identify specific Bylaw provision [*sic*] Burney allegedly violated." Mot. at 5. Thus, according to the Union, because Matthews-Pace never satisfied the conditions precedent to initiate the disciplinary process, no obligation arose for the Union to breach. *See* Mot. at 5. This Court disagrees.

11

The record shows that Matthews-Pace wrote eight complaints against Burney and that the complaints were all sent well within the thirty-day requirement, most within 24 hours of the incident. *See* Sec. Am. Compl. at 13-21. The first four complaints were addressed to the Executive Board, which includes the Secretary-Treasurer as a member. The latter four complaints were all transmitted to the email address of the Secretary-Treasurer. *See* PSAF ¶¶ 1-3; DSAF ¶¶ 1-3. The undersigned is satisfied that this conduct is more than sufficient to create a fact issue as to whether Matthews-Pace satisfied the requirements to invoke the disciplinary process under the Bylaws by substantially complying with the charge requirements of Article XVI. *See Sunshine Children's Learning Ctr., LLC v. Waste Connections of Fla., Inc.*, No. 21-cv-62123, 2023 WL 2809509, at *8 (S.D. Fla. Apr. 6, 2023) (Bloom, J.) ("Substantial compliance or performance is that performance of a contract which, while not full performance, is so nearly equivalent to what was bargained for that it would be unreasonable to deny the other party the benefit of the bargain." (internal citation omitted)).

The Union is asking this Court to read in additional "claim processing rules" that do not actually appear in Article XVI, such as identifying a specific Bylaw provision and requesting a trial board hearing in the written charge. Lacking any authority for adding these additional hurdles, this Court will not write them into the Bylaws' requirements now.

Thus, the Union's threshold challenge to Count I fails, and this Court turns then to the issue of whether any provisions of the Bylaws were breached.

1.  <u>Work Rules.</u>

The Union argues that Article XVIII, the Work Rules section, merely sets forth general expectations for member conduct but contains no enforcement mechanism or disciplinary process. While Matthews-Pace alleges in the Second Amended Complaint that the Union

breached the Bylaws by failing to enforce Sections 1 and 2 of its Work Rules against Burney, he does not rebut the Union's argument that the Union is not contractually obligated to Matthews-Pace to enforce the Work Rules in any particular manner. *See Mitchell v. ConAgra Foods, Inc.*, 448 F. App'x 911, 914 (11th Cir. 2011) (holding that when a plaintiff fails to respond to an issue on summary judgment, he waives the argument). The undersigned agrees with the Union that the Bylaws only list the offenses under Article XV as "Offenses For Which Officers and Members May Be Charged and Tried," not the Work Rules in Article XVIII. Absent an enforcement mechanism in Article XVIII or any provision incorporating the Work Rules into the enforcement procedure of Articles XV and XVI, it is unclear how a failure of the Union to enforce its Work Rules constitutes a breach of any Bylaw provision.

### 2. Failure To Investigate Burney.

Matthews-Pace contends that the Union violated Article XVI, Section 1 when it ignored his complaints against Burney: "A charge may be filed by any member. All charges must be in writing and within thirty (30) days of the occurrence of the fact or event giving rise to the charge filed with the Financial Secretary-Treasurer who shall refer the same to the Trial Board for action." Sec. Am. Compl. at 64. Matthews-Pace's argument here is that under the plain language of this provision, the Union leadership was required to refer the complaint ("shall refer the same") to the Trial Board for action.

The Union argues that it did not breach the Bylaws by failing to refer Matthews-Pace's complaints to the Trial Board for action because none of the Burney conduct that Matthews-Pace complained of constituted a breach of the Bylaws. In other words, because Matthews-Pace's complaints all concerned conduct not covered by the Bylaws, there was no Bylaw provision through which the Union could have charged Burney. *See* Mot. at 6.

13

While Matthews-Pace did not specifically refer to Bylaw provisions in his complaints, he argues that the Burney conduct he complained was conduct that contravenes Article XV, §§ 1(e), (i), and (l) breaches. Section 1(e) prohibits "[a]buse of fellow members." Sec. Am. Compl. at 63. Section 1(i) penalizes "[r]efusal of a member to carry out a needed operation or task when requested to do so by the Business Agent." *Id.* at 64. And Section 1(l) penalizes any "[f]ailure of a member to report for work at a specified time after giving a Header his card." *Id.*

The Union points out, and Matthews-Pace admits, that none of his complaints mention that the Business Agent asked for the completion of any of the tasks that Burney refused to do, so those complaints do not fall cleanly into Section 1(i). *See* DSOF ¶ 12; PSOF ¶ 12. The Union also argues that the complaints about Burney leaving early do not trigger action under Section 1(l) because Matthews-Pace never specified that Burney failed to report "after giving a Header h[er] card." *See* Mot. at 6. As to Section 1(e), the Union argues that Burney's mere failure to follow Matthews-Pace's instructions cannot constitute abuse of a fellow member as contemplated in the Bylaws. *See id.*

Matthews-Pace responds that there are questions of fact as to whether his complaints were sufficient to trigger the Union's duty under Article XVI "to investigate, formally charge the accused, and render a decision on the charge." Resp. at 12 (quotations omitted). The Union argues in its Reply that this Court should not read an intent to make a formal charge from Matthews-Pace's written complaints as that "would effectively render any written complaint or criticism of another member a formal charge, obligating the Union to investigate or initiate disciplinary proceedings on pain of contractual breach." Reply at 2. However, the record of Matthews-Pace's complaints, taken as a whole, appears to go further than off-hand

criticism of a member, and the complaints often do request further Union action. *See, e.g.*, Sec. Am. Compl. at 16 ("I am requesting that you please set a meeting and get to the bottom of this problem."); *id.* at 21 ("[A]s her supervisor I would like you to know this is unacceptable and enough is enough.").

Turning to the Bylaws, Article XVI uses mandatory language, "shall refer the [charge] to the Trial Board for action," and it does not provide for an "in house" vetting process by which the Union may exercise its discretion in determining which charges should actually be referred to the Trial Board for action. *See* Sec. Am. Compl. at 64. If the complaints, when viewed in the light most favorable to Matthews-Pace and with all factual inferences stemming therefrom construed in his favor, constitute charges of Bylaw violations, then the complaints were sufficient to trigger the Union's obligation to investigate and adjudicate. This Court finds that a reasonable jury could find that they are.

For starters, the undersigned notes that "charge" is not defined in the Bylaws except that it must be in writing and issued to the Secretary-Treasurer within thirty days of the event giving rise to the charge. *See id.* The Bylaws set forth no requirement to include the word "charge" or use any particular form. There is also no requirement to set forth all the ultimate facts necessary to prove each alleged violation in the written complaint.[6]

---

[6] As Matthews-Pace points out, in the grievance issued by Secretary-Treasurer Dana Ferguson against Matthews-Pace, under "Type of Grievance, Dispute, etc." Ferguson wrote "Insubordination. Hanging up the phone with Pres[.] E. Dixon & Vp. S. Hopkins." *See generally* ECF No. 51-3 ("January 21 Charge"). The January 21 charge cites Bylaw provision Article XV, "Refusal of a member to carry out a needed operation or task when requested to do so by the Business Agent." *Id.* The form is titled "Grievance" and does not reference the word "charge" anywhere. The January 21 Charge is recognized by all parties as a procedurally valid misconduct charge under the Bylaws that resulted in disciplinary proceedings being opened against Matthews-Pace. *See* DSOF ¶¶ 36-38; PSOF ¶¶ 36-38. The January 21 Charge also undercuts the Union's argument that Matthews-Pace's failure to use the word "Business Agent" eliminates any obligation the Union had to investigate reports of

In other words, when the entire record is viewed in Matthews-Pace's favor, a reasonable jury could find that some of the complaints Matthews-Pace filed constitute "charges" that the Union was obliged to investigate and adjudicate and that its failure to do so constitutes a breach of the Bylaws.

### 3.   Implied Covenant Of Good Faith And Fair Dealing.

The Union attaches its implied covenant of good faith and fair dealing argument to its breach of Bylaws argument, arguing that because the Union did not breach any express term of the Bylaws, an implied covenant claim necessarily fails. *See* Mot. at 7 (citing *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001)). The Union does not provide any other argument as to why it is entitled to summary judgment on the implied covenant claim.

Because this Court does not agree with the premise of the Union's argument that Matthews-Pace has not shown that the Union breached any express term of the Bylaws, the Union has not met its burden to show that it is entitled to judgment as a matter of law on the implied covenant of good faith and fair dealing claim.

### 4.   Contractual Damages.

The Union's final argument regarding the breach of contract claim is that the record does not show any damages resulting from any alleged breach. After all, it is undisputed that

---

Burney refusing to complete the tasks assigned to her or that Matthews-Pace's failure to mention the phrase "after giving a Header her card" in his complaint about Burney leaving early eliminates the Union's obligation to investigate her absences because when the Union accepted and investigated the January 21 Charge that read "Insubordination. Hanging up the phone[,]" it did not set forth any facts that Matthews-Pace failed to carry out a task requested by the Business Agent (which is the conduct the charge was actually punishing).

Matthews-Pace remains employed in the same position at the same location and without any harm to his seniority status. *See* DSOF ¶¶ 57-60; PSOF ¶¶ 57-60.

Matthews-Pace responds that under Florida law, a party is entitled to nominal damages upon a finding of breach of contract even if no proof of further damages is shown. *See* Resp. at 16. The Union argues in Reply that the core issue is that there is no showing of any harm resulting from the Union's breach; it is not the quantity of damages at issue, but the question of whether the breach caused any harm at all. *See* Reply at 4-5.

This Court finds that the prospect of nominal damages is sufficient for Matthews-Pace to survive summary judgment on his breach of contract claim.[7] *See Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1418 (11th Cir. 2011) ("Florida law does require an award of at least nominal damages if a breach of contract has been established." (citing *MSM Golf, L.L.C. v. Newgent*, 853 So. 2d 1086, 1087 (Fla. 5th DCA 2003)); *see also Hayden v. Urvan*, No. 21-82051-CIV, 2023 WL 11816783, at *1 (S.D. Fla. Sept. 14, 2023) (Smith, J.) (applying Florida law and holding that while damages are an element of a breach of contract claim, if the plaintiff can "prove the other elements of his claim but [is] unable to prove his damages with the

---

[7] Even setting aside nominal damages, this Court finds that there are sufficient facts in the record upon which a jury could find that Matthews-Pace was damaged by the Union's breach. In the grievances, Matthews-Pace draws attention to how the entire work team is adversely affected by Burney's alleged misconduct, and how he is forced to pick up the slack when she leaves early or refuses to do the work assigned to her. Several months after his last grievance, on July 15, 2024, the Union suspended Matthews-Pace as a Header "until the matter concerning Ms. Lynette Burney, second man can be heard by the LRC Board. This issue to be heard by the LRC is a matter of your neglect as the Header to instruct and respond appropriately in a timely manner to a situation the required immediate attention." [ECF No. 51-2 at 7]. Following the LRC hearing, the Union suspended Matthews-Pace until October 1, 2024. *Id.* at 9. A reasonable jury could conclude that but for the Union's failure to investigate and resolve Matthews-Pace's charges against Burney, the Union would not have suspended him based on the matters concerning Burney because the issues with Burney would have been resolved long before July 2024.

necessary certainty, he would be entitled to nominal damages for his claim for breach"); *Beverage Canners, Inc. v. Cott Corp.*, 372 So. 2d 954, 956 (Fla. 3d DCA 1979) ("Nominal damages may be awarded when the breach of an agreement or invasion of a right is established, since the law infers some damage to the injured party; where there is insufficient evidence presented to ascertain the particular amount of loss, the award of nominal damages is proper." (citation omitted)).

Because there are sufficient facts in the record through which a reasonable jury could conclude that the Union breached its Bylaws and that such breach caused Matthews-Pace at least nominal damages, summary judgment on the breach of contract claim is due to be denied.

### B. Count II: Breach Of The Duty Of Fair Representation ("DFR").

The Union next argues that it is entitled to summary judgment on Matthews-Pace's duty of fair representation ("DFR") claim in Count II. A plaintiff shows that a union breaches its duty of fair representation by showing that the union's actions were "arbitrary, discriminatory, or in bad faith." *Taaffe v. Bellsouth Telecomms., Inc.*, 204 F. App'x 823, 824 (11th Cir. 2006) ("In assessing whether a union has breached its duty of fair representation, we are limited to the determination of whether the union's actions were 'arbitrary, discriminatory, or in bad faith.'" (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' . . . as to be irrational." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67 (1991). To demonstrate bad faith, a plaintiff must show that the union "acted with any sort of improper motive or purpose." *Oltmanns v. Int'l Longsoresmen's Ass'n*, 837 F. App'x 689, 696-97 (11th Cir. 2020).

18

"Cases are uniform in holding that neither negligence on the part of the union nor a mistake in judgment is sufficient to support a claim that the union acted in an arbitrary and perfunctory manner," and that "[n]othing less than a demonstration that the union acted with reckless disregard for the employee's rights or was grossly deficient in its conduct will suffice to establish [a breach of its duty of fair representation]." *Harris v. Schwerman Trucking Co.*, 668 F.2d 1204, 1206 (11th Cir. 1982) (citations omitted).

As it pertains to how a union assesses or settles a grievance, the underlying merit of the grievance has little impact on whether the union breached its DFR. *See Taaffe*, 204 F. App'x at 824 ("Nor does our review of a union's settlement of a grievance focus on whether the underlying grievance had merit."). "It is settled law that a breach of the fair representation duty cannot be based on the trial court's view regarding the probability of success on the merits of the grievance." *Freeman v. O'Neal Steel, Inc.*, 609 F.2d 1123, 1126 (5th Cir. 1980); *see also Vaca*, 386 U.S. at 195 ("[B]reach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious."). Meanwhile, "a union breaches its duty when it arbitrarily ignores a meritorious grievance or processes it in a perfunctory fashion." *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 47 (1979) (citation modified). "In short, the issue is not whether the union's interpretation of the facts and contract language was correct, but whether it was arbitrary." *Taaffe*, 204 F. App'x at 825.

The record in this case reflects there are genuine issues of material fact precluding entry of judgment as a matter of law on the DFR claim.

19

In July 2024, after receiving approximately eight complaints from Matthews-Pace about Burney's work performance and ignoring each one,[8] the Union suspended Matthews-Pace for failure "to instruct and respond appropriately in a timely manner to a situation requiring immediate attention at the Port." [ECF No. 51-2 at 7]. Only Matthews-Pace opted to provide a factual narrative of what happened to precipitate the July 2024 suspension, stating: "I didn't do anything wrong that day. I asked my subordinate to take something out, and she refused it, and they suspended me." [ECF No. 51-1 at 28:20-22]. Then, when the issue came before the LRC, it summarily ratified the Union's suspension and extended the term of punishment through October 1, 2024. *See* DSOF ¶¶ 26, 28; PSOF ¶¶ 26, 28.

While the LRC does have a veneer of independence because it is made up of both representatives of the employers and of the Union, *see* DSOF ¶ 25; PSOF ¶ 25, there is nothing in the record to suggest that the LRC actually undertook a review of the charges against Matthews-Pace.[9] *See* ECF No. 51-2 at 9. Put differently, the record does not show the absence of any genuine issue of material fact as to whether the Union "arbitrarily ignore[d] a meritorious grievance," processed the one against Matthews-Pace "in a perfunctory fashion," or that its treatment of Matthews-Pace with reference to the July-October 2024 suspension was so far outside the realm of reasonableness so as to be irrational. *See Foust*, 442 U.S. at 47; *Air Line Pilots*, 499 U.S. at 67. A reasonable jury could agree with Matthews-Pace's assertion

---

[8] The Union had the opportunity through several witnesses, including the Union President and Secretary-Treasurer themselves, to offer evidence to show that Matthews-Pace's grievances had been investigated or otherwise not "processed in a perfunctory fashion." No Union witnesses made a representation that the Burney grievances were as much as even glanced at.

[9] Matthews Pace calls the LRC a "hanging squad" that the Union uses to push its agenda. "Whatever the local decides . . . they want to happen to you, that is what the LRC does to you." [ECF No. 51-1 at 28:15-17]. Taken in isolation, this statement is conclusory.

that the LRC is merely a "hanging squad" based on its perfunctory approval of the Union's grievances in this case without making any written findings or conclusions, nor setting forth any procedure followed to ensure fundamental fairness. *See McSmith v. Unite Here Local 23*, No. 18-cv-4233-SCJ, 2020 WL 10692532, at \*7 (N.D. Ga. May 21, 2020) (granting summary judgment in DFR case because the union *did not* ignore the plaintiff's grievance, it *investigated* the charges and *collected evidence* in the form of witness statements and photographs and documents before it decided not to pursue the grievance).

While a Union "is accorded a wide range of reasonableness in the exercise of its discretion," "it is circumscribed by a duty to act with complete good faith and honesty of purpose[.]" *Schwerman*, 668 F.2d at 1206 (internal quotation marks omitted). "It is beyond doubt that the duty of fair representation includes an obligation to investigate and to ascertain the merit of employee grievances." *Turner v. Air Transp. Dispatchers' Ass'n*, 468 F.2d 297, 299 (5th Cir. 1972).[10]

There is sufficient factual matter in the record, when construed in Matthews-Pace's favor, for a jury to find that the Union "ignored the [Burney] grievance[s], inexplicably failed to take some required step, or gave the grievance[s] merely cursory attention," when the Union disciplined him in July 2024. *Schwerman*, 668 F.2d at 1206. Because this Court finds the record sufficient for the DFR claim to survive with respect to the Burney grievances and the July 2024 suspension, it is not necessary to analyze any of the other instances that Matthews-Pace alleges the Union violated its DFR. The Motion is due to be denied as to Count II.

---

[10] *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (adopting Fifth Circuit decisions issued prior to the close of business on September 30, 1981).

### C. *Count III: Intentional Infliction Of Emotional Distress (IIED).*

Matthews-Pace's IIED claim does not fare so well. To succeed on a claim for IIED under Florida law, a plaintiff must prove that

> (1) the wrongdoer's conduct was intentional or reckless, that is, he or she intended the behavior when he or she knew or should have known that emotional distress would likely result; (2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe.

*Khan v. Rundle*, No. 05-23123-CIV, 2006 WL 8433501, at *1 (S.D. Fla. Apr. 28, 2006) (Altonaga, J.) (citing *Brown v. Brown*, 800 So. 2d 359, 362-63 (Fla. 4th DCA 2001)). "Florida courts have been very clear in requiring a plaintiff to show that he or she has been subjected to *truly extreme conduct* before a claim for intentional infliction of emotional distress will lie." *Id.* (emphasis in original). The Florida Supreme Court has discussed the issue further:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985). "The question of what constitutes outrageous conduct is a matter of law to be resolved by the court." *Elger v. Martin Mem. Health Sys., Inc.*, 6 F. Supp. 2d 1351, 1354 (S.D. Fla. 1998) (Moore, J.). Against this backdrop, this Court turns to the record evidence regarding whether Matthews-Pace endured "*truly extreme conduct*" that goes "beyond all possible bounds of decency."

Matthews-Pace argues that by ignoring his grievances for a year and then making him the target of their hostility, including a phone call during which Dixon, the President of the

Union, cursed out Matthews-Pace, the Union engaged in outrageous behavior. The undersigned finds that these facts, construed in the light most favorable to Matthews-Pace, fall more into the realm of workplace bullying. "Florida and federal courts are generally reluctant to recognize outrageous conduct in the employment context." *Paraohao v. Bankers Club, Inc.*, 225 F. Supp. 2d 1353, 1361 (S.D. Fla. 2002) (Bandstra, M.J.); *see id.* ("In fact, federal courts in this circuit have consistently held that even acts of lewd physical touching and obscene suggestive comments in sexual harassment cases, . . . were not sufficiently outrageous, as a matter of law, to establish a claim for intentional infliction of emotional distress in the employment context.").

Even viewing the facts in the light most favorable to Matthews-Pace, this Court finds, as a matter of law, that the conduct he identifies is not sufficiently atrocious nor utterly intolerable such that it could be considered "outrageous" for purposes of an IIED claim. Because the factual record is insufficient to support the "outrageous" element, a reasonable jury could not find the Union liable for IIED.

## IV. CONCLUSION

Having construed the facts in the record in the light most favorable to Matthews-Pace, the nonmovant, this Court finds that the Union is not entitled to summary judgment as to Counts I or II, but it has shown that there is no genuine issue of material fact as to the IIED claim, and, therefore, the Union is entitled to summary judgment as to Count III.

Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment [**ECF No. 50**] is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is entered in favor of Defendant, International Longshoremen's Association, AFL-CIO, Local

1416, as to Count III of the Second Amended Complaint. The Motion is denied as to Counts I and II. It is further

ORDERED that the Motion to Dismiss **[ECF No. 39]** is **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers in the Southern District of Florida, this 27th day of July, 2026.

**MELISSA DAMIAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

24